1  **BRIDGET KENNEDY**
   California State Bar No. 253416
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California  92101-5030
   Telephone:  (619) 234-8467, ext. 3740
4  Fax: (619) 687-2666
   Bridget_Kennedy@fd.org
5
6  Attorneys for Ms. Sanchez
7
8
9                    UNITED STATES DISTRICT COURT
10                 SOUTHERN DISTRICT OF CALIFORNIA
11                 (**HONORABLE JEFFREY T. MILLER**)

12  UNITED STATES OF AMERICA,        )   CASE NO.  08CR0647-JM
                                     )
13              Plaintiff,           )
                                     )
14  v.                               )   STATEMENT OF FACTS AND
                                     )   MEMORANDUM OF POINTS AND
                                     )   AUTHORITIES IN SUPPORT OF
15  ALMA ANDREA SANCHEZ,             )   DEFENDANT'S MOTIONS.
                                     )
16              Defendant.           )
    _____ )
17

18                              **I.**

19                     **STATEMENT OF FACTS**[1]

20          On February 24, 2008, Alma Andrea SANCHEZ applied for entry into the United

21  States from Mexico at the Calexico, CA West Port of Entry.  She was driving a 1999 Chevrolet

22  Blazer with license plate 6AZX987.  Customs and Border Protection Officer Oceguera questioned

23  Ms. Sanchez about the vehicle.  Ms. Sanchez replied that she had owned the vehicle for about four

24  months, gave a negative declaration, and stated that she was returning from visiting friends in

25  Mexicali.  Ms. Sanchez was referred to secondary.

26  _____

27          [1]The statement of facts is based on the government's complaint and probable cause statement.
28  Ms. Sanchez does not admit their accuracy and reserves the right to challenge them at a later time.

1  Ms. Sanchez also gave a negative declaration to Officer Lepe in secondary inspection.

2  Officer Lepe requested a canine screening, which alerted to the rear of the vehicle.  During further

3  inspection, 54.10 kilograms of marijuana were discovered in the vehicle.

4  On March 5, 2008, the January 2007 Grand Jury filed an indictment charging Ms.

5  Sanchez with importing 50 kilograms or more of marijuana in violation of Title 21 U.S.C. §§ 952

6  & 960 and possessing with intent to distribute 50 kilograms or more of marijuana, in violation of 21

7  U.S.C. §841(a)(1).

8  **II.**

9  **MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE**

10  At this time, Ms. Sanchez has not received any discovery.  Ms. Sanchez requests the

11  following discovery.  Her request is not limited to items the prosecutor is aware of.  It includes all

12  discovery listed below that is in the custody, control, care, or knowledge of any "closely related

13  investigative [or other] agencies."  See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

14  (1) Brady Material.  The defendant requests all documents, statements, agents' reports,

15  and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the

16  credibility of the government's case.  Under Brady, impeachment as well as exculpatory evidence

17  falls within the definition of evidence favorable to the accused.  United States v. Bagley, 473 U.S.

18  667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

19  (2) Any Proposed 404(b) Evidence.  The government must produce evidence of prior

20  similar acts under Fed. R. Crim. P. 16(a)(1) and Fed. R. Evid. 404(b) and any prior convictions

21  which would be used to impeach as noted in Fed. R. Crim. P. 609.  In addition, under Fed. R. Evid.

22  404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance

23  of trial . . . of the general nature" of any evidence the government proposes to introduce under Fed.

24  R. Evid. 404(b) at trial.  The defendant requests such notice two weeks before trial in order to give

25  the defense time adequately to investigate and prepare for trial.

26  (3) Evidence Seized.  The defendant requests production of evidence seized as a result

27  of any search.  Fed. R. Crim. P. 16(a)(1)(E).  She wishes to inspect the evidence before trial.

28  **Specifically, the defense requests the opportunity to inspect the vehicle seized in this case.  In**

**addition, the defense wishes to inspect the 54.10 kilograms of marijuana allegedly found in the seized vehicle.** <u>See</u> Section III, below. **A preservation order is attached below for this Court's signature.**

(4) <u>Request for Preservation of Evidence</u>. The defendant specifically requests the preservation of all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case. This request includes, but is not limited to, any samples of narcotics used to run any scientific tests, any narcotics, the results of any fingerprint analysis, the vehicle which the defendant drove, the defendant's personal effects, and any evidence seized from the defendant or any third party.

In addition, Ms. Sanchez specifically requests that the Assistant United States Attorney assigned to this case oversee a review of all personnel files of each agent involved in the present case for impeachment material. <u>Kyles v. Whitley</u>, 115 S. Ct. 1555 (1995); <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991); <u>but see</u> <u>United States v. Herring</u>, 83 F.3d 1120 (9th Cir. 1996).

(5) <u>Tangible Objects</u>. The defendant seeks to inspect and copy as well as test, if necessary, all other documents and tangible objects, including photographs, books, papers, documents, alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to the defendant. Fed. R. Crim. P. 16(a)(1)(E). **A preservation order is attached below for this court to sign.**

(6) <u>Expert Witnesses</u>. The defendant requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(G).

(7) <u>Evidence of Bias or Motive to Lie</u>. The defendant requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his testimony.

(8) <u>Impeachment Evidence</u>. The defendant requests any evidence that any prospective government witness has engaged in any criminal act, whether or not resulting in a conviction, and

1  whether any witness has made a statement favorable to the defendant.  See Fed. R. Evid. 608, 609

2  and 613; Brady v. Maryland, 83 S. Ct. 1194 (1963).

3          (9)  Evidence of Criminal Investigation of Any Government Witness.  The defendant

4  requests any evidence that any prospective witness is under investigation by federal, state or local

5  authorities for any criminal conduct.

6          (10)  Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth

7  Telling.  The defense requests any evidence, including any medical or psychiatric report or

8  evaluation, that tends to show that any prospective witness' ability to perceive, remember,

9  communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics

10  or other controlled substance, or has ever been an alcoholic.

11          (11)  Witness Addresses.  The defendant requests the name and last known address of

12  each prospective government witness.  The defendant also requests the name and last known address

13  of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance

14  thereof) who will not be called as a government witness.

15          (12)  Name of Witnesses Favorable to the Defendant.  The defendant requests the name

16  of any witness who made an arguably favorable statement concerning the defendant.

17          (13)  Statements Relevant to the Defense.  The defendant requests disclosure of any

18  statement relevant to any possible defense or contention that he might assert.

19          (14)  Jencks Act Material.  The defendant requests production in advance of trial of all

20  material, including dispatch tapes, which the government must produce pursuant to the Jencks Act,

21  18 U.S.C. § 3500.  Advance production will avoid the possibility of delay at the request of defendant

22  to investigate the Jencks material.

23          (15)  Giglio Information.  Under Giglio v. United States, 92 S. Ct. 763 (1972), the

24  defendant requests all statements and/or promises, express or implied, made to any government

25  witnesses, in exchange for their testimony in this case, and all other information which could

26  arguably be used for the impeachment of any government witnesses.

27          (16)  Scientific and Other Information.  To the extent not already provided, the

28  defendant requests  the results of any scientific or other tests or examinations, including testing done

on the alleged marijuana.  See Rule 16(a)(1)(F).

(17)  Informants and Cooperating Witnesses.  The defense requests disclosure of the name(s), address(es), and location(s) of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the charged crime.  Roviaro v. United States, 353 U.S. 52, 61-62 (1957).  The government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.  Brady v. Maryland, 373 U.S. 83 (1963).  The government must disclose any information indicating bias on the part of any informant or cooperating witness.  Id.

(18)  Personnel Records of Government Officers Involved in the Arrest.  Mr. Lopez-Gonzalez specifically requests all citizen complaints and other related internal affairs documents involving any of the Customs officers or other law enforcement officers who were involved in the investigation, arrest and interrogation of his, pursuant to Pitchess v. Superior Court, 11 Cal. 3d 531, 539 (1974).  Because of the sensitive nature of these documents, defense counsel will not be able to procure them from any other source.

(19)  Government Examination of Law Enforcement Personnel Files.  The defendant requests that the Government examine the personnel files and any other files within its custody, care or control, or which could be obtained by the government, for all testifying witnesses, including testifying officers.  She requests that these files be reviewed by the Government attorney for evidence of perjurious conduct or other like dishonesty, or any other material relevant to impeachment, or any information that is exculpatory, pursuant to its duty under United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991).  Only the prosecutor has the legal knowledge and ethical obligations to fully comply with this request.

(20)  Training of Border Patrol and DEA Agents.  The defendant requests copies of any and all written policies and/or training manuals issued by the Department of Homeland Security to their employees regarding:  (1) the handling of vehicles suspected to be transporting illegal contraband near the border; (2) the detention of individuals within those vehicles suspected of carrying contraband; and (3) the search of those vehicles and the occupants of those vehicles.

//

(21) <u>Residual Request</u>. Ms. Sanchez intends by this discovery motion to invoke her rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. Ms. Sanchez requests that the government provide her with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

### III.

### <u>MOTION TO PRESERVE AND RE-WEIGH NARCOTIC EVIDENCE</u>

Ms. Sanchez requests an order for the U.S. Government and its agents to preserve the narcotic evidence in this case and permit the defense to re-weigh any narcotic evidence. For the Court's convenience, a proposed order is attached to these motions.

### IV.

### <u>THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING Mr. CAMACHO-MELENDEZ OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY</u>

**A.      Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury. That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007. <u>See</u> Reporter's Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A. Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[2] These instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A. <u>See</u> Reporter's Transcript

---

[2] <u>See</u>, <u>e.g.</u>, <u>United States v. Cortez-Rivera</u>, 454 F.3d 1038 (9th Cir. 2006); <u>United States v. Navarro-Vargas</u>, 408 F.3d 1184 (9th Cir.) (<u>en banc</u>), cert. denied, 126 S. Ct. 736 (2005) (<u>Navarro-Vargas II</u>); <u>United States v. Navarro-Vargas</u>, 367 F.3d 896 (9th Cir. 2004)(<u>Navarro-Vargas I</u>); <u>United States v. Marcucci</u>, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

08CR0647-JM

of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[3]

**1. Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which he excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, Judge Burns not only instructed the grand jurors on his view of their discretion; he enforced that view on pain of being excused from service as a

---

[3] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury. Ms. Sanchez requests that the video presentation be produced. See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[4] See also id. at 20 ("You're all about probable cause.").

08CR0647-JM

1    grand juror.

2        Examination of the voir dire transcript, which contains additional instructions and

3    commentary in the form of the give and take between Judge Burns and various prospective grand

4    jurors, reveals Judge Burns's emphasis on the singular duty to determine whether or not probable

5    cause exists, and his statement that grand jurors cannot judge the wisdom of the criminal laws

6    enacted by Congress merely compounded an erroneous series of instructions already given to the

7    grand jury venire. In one of his earliest substantive remarks, Judge Burns makes clear that the grand

8    jury's sole function is probable cause determination.

9            [T]he grand jury is determining really two factors: "do we have
             a reasonable belief that a crime was committed? And second, do
10           we have a reasonable belief that the person that they propose that
             we indict committed the crime?"

11
             If the answer is "yes" to both of those, then the case should move
12           forward. If the answer to either of the questions is "no," then the
             grand jury should not hesitate and not indict.

13

14   See Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear

15   that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional

16   when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a

17   crime was committed" or if it has no "reasonable belief that the person that they propose that we

18   indict committed the crime."

19       Equally revealing are Judge Burns's interactions with two potential grand jurors who

20   indicated that, in some unknown set of circumstances, they might decline to indict even where there

21   was probable cause. Because of the redactions of the grand jurors' names, Ms. Sanchez will refer

22   to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is

23   a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered

24   illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The

25   CSW was also troubled by certain unspecified immigration cases. See id.

26       Judge Burns made no effort to determine what sorts of drug and immigration cases

27   troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases

28   actually filed in this district, such as drug smuggling cases and cases involving reentry after

1  deportation and alien smuggling.  Rather, he provided instructions suggesting that, in any event, any

2  scruples CSW may have possessed were simply not capable of expression in the context of grand

3  jury service.

> 4  Now, the question is can you fairly evaluate [drug cases and
> 5  immigration cases]?  Just as the defendant is ultimately entitled
>    to a fair trial and the person that's accused is entitled to a fair
> 6  appraisal of the evidence of the case that's in front of you, so, too,
>    is the United States entitled to a fair judgment.  If there's probable
> 7  cause, then the case should go forward.  *I wouldn't want you to
>    say*, "well, yeah, there's probable cause, but I still don't like what
> 8  our government is doing.  I disagree with these laws, so I'm not
>    going to vote for it to go forward."  If that is your frame of mind,
> 9  the probably you shouldn't serve.  Only you can tell me that.

10  See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let

11  the grand juror know that he would not want him or her to decline to indict in an individual case

12  where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there

13  was probable cause.  See id.  Such a case "should go forward."  See id.  Given that blanket

14  proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the

15  CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence

16  warranted it."  See id.  Again, Judge Burns's question provided no context; he inquired regarding

17  "a case," a term presumably just as applicable to possession of a small amount of medical marijuana

18  as kilogram quantities of methamphetamine for distribution.  Any grand juror listening to this

19  exchange could only conclude that there was *no* case in which Judge Burns would permit them to

20  vote "no bill" in the face of a showing probable cause.

21  Just in case there may have been a grand juror that did not understand his or her

22  inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his

23  exchange with REA.  REA first advised Judge Burns of a concern regarding the "disparity between

24  state and federal law" regarding "medical marijuana."  See id. at 24.  Judge Burns first sought to

25  address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are

26  simply forbidden from taking penalty considerations into account.

> 27  Well, those things -- the consequences of your determination
>    shouldn't concern you in the sense that penalties or punishment,
> 28  things like that -- we tell trial jurors, of course, that they cannot

1
2
3

> consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

4   Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge

5   Burns went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at

6   25.

7       In response to further questioning, REA disclosed REA's belief "that drugs should be

8   legal." See id. That disclosure prompted Judge Burns to begin a discussion that ultimately led to an

9   instruction that a grand juror is obligated to vote to indict if there is probable cause.

10
11
12
13

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."

14
15
16

> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.

17
18
19

> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

20   Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test,

21   which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

22       Having set forth the duty to indict, and being advised that REA was "uncomfortable"

23   with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation

24   from the obligation to indict in every case in which there was probable cause.

25
26

> The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.

27
> The Court: Is there a chance that you would do that?
> REA: Yes.

28
> The Court: I appreciate your answers. I'll excuse you at this time.

1

2    Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely

3    on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case,"

4    see id., as it should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that

5    REA would vote to indict in some (perhaps many or even nearly all) cases in which there was

6    probable cause.  Again, Judge Burns made no effort to explore REA's views; he did not ascertain

7    what sorts of cases would prompt REA to hesitate.  The message is clear: it does not matter what

8    type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the

9    "obligation" is "to vote in favor of the case going forward."[5]  See id. at 27.  That is why even the

10   "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

**2.  The Instructions Posit a Non-Existent Prosecutorial Duty to
Offer Exculpatory Evidence.**

13       In addition to his instructions on the authority to choose not to indict, Judge Burns also

14   assured the grand jurors that prosecutors would present to them evidence that tended to undercut

15   probable cause.  See Ex. A at 20.[6]

16   _____

17       [5] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate

18   judge will have determined the existence of probable cause "in most circumstances" before it has
     been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding

19   probable cause in each case because had a magistrate judge not so found, the case likely would not
     have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it

20   merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction

21   made the grand jury more inclined to indict irrespective of the evidence presented.

22       [6] These instructions were provided in the midst of several comments that praised the United
     States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they

23   "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be
     honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The

24   instructions delivered during voir dire go even further.  In addressing a prospective grand juror who
     revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38,

25   Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even

26   while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense
     to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith

27   to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to
     indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate

28   the charges against.").

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B.      Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the

---

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

08CR0647-JM

1   course of adopting a highly formalistic approach[7] to the problems posed by the instructions, endorsed
2   many of the substantive arguments raised by the defendants in those cases.  The district court's
3   instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II.
4   Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond
5   those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential
6   grand jury, focused solely upon probable cause determinations and utterly unable to exercise any
7   quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United States
8   v. Williams, 504 U.S. 36, 49 (1992).

9          For instance, with respect to the grand jury's relationship with the prosecution, the
10  Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the
11  public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up,
12  performs much the same function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting
13  Butz v. Economou, 438 U.S. 478, 510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d
14  896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion
15  in this regard "is most accurately described as prosecutorial.").  See also Navarro-Vargas II, 408 F.3d
16  at 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any
17  indictment or presentment returned by a grand jury, id., but also that "the grand jury has no
18  obligation to prepare a presentment or to return an indictment drafted by the prosecutor."  Id.  See
19  Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal
20  Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably
21  . . . the most important attribute of grand jury review from the perspective of those who insisted that
22  a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal
23  Procedure § 15.2(g) (2d ed. 1999)).

24         Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the
25  attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

26  _____

27      [7]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
    majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
28  imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
    constitutional independence.").

1
2
3
4

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

5    Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's

6    description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that

7    the grand jury "controls not only the initial decision to indict, but also significant questions such as

8    how many counts to charge and whether to charge a greater or lesser offense, including the important

9    decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge

10   Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the

11   majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor

12   has established probable cause that this individual has committed a crime." See id. at 1214

13   (Hawkins, J., dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting);

14   United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

15   dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth

16   Circuit. But not in Judge Burns's instructions.

17   **C.     Judge Burns's Instructions Forbid the Exercise of Grand Jury
            Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

18

19        The Navarro-Vargas II majority found that the instruction in that case "leave[s] room

20   for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis

21   in its previous decision in Marcucci. Marcucci reasoned that the instructions do not mandate that

22   grand jurors indict upon every finding of probable cause because the term "should" may mean "what

23   is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should"

24   makes no sense in context, as Judge Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at

25   1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be

26   understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe

27   the grand jury's constitutional independence."). See also id. ("The 'word' should is used to express

28   a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579 (1999)

1    (brackets in original)).

2    The debate about what the word "should" means is irrelevant here; the instructions here

3    make no such fine distinction.  The grand jury instructions make it painfully clear that grand jurors

4    simply may not choose not to indict in the event of what appears to them to be an unfair application

5    of the law: should "you disagree with that judgment made by Congress, then your option is not to

6    say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...."

7    See Ex. A at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because

8    they disagree with a proposed prosecution. No grand juror would read this language as instructing,

9    or even allowing, him or her to assess "the need to indict." Vasquez, 474 U.S. at 264.

10    While Judge Burns used the word "should" instead of "shall" during voir dire with

11    respect to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, n context,

12    it is clear that he could only mean "should" in the obligatory sense.  For example, when addressing

13    a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable

14    cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not

15    indict." See id. at 8.  At least in context, it would strain credulity to suggest that Judge Burns was

16    using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no]

17    probable cause." See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was not.

18    The full passage cited above effectively eliminates any possibility that Judge Burns

19    intended the Navarro-Vargas spin on the word "should."

20    [T]he grand jury is determining really two factors: "do we have
      a reasonable belief that a crime was committed?  And second, do
21    we have a reasonable belief that the person that they propose that
      we indict committed the crime?"
22
23    If the answer is "yes" to both of those, then the case should move
      forward.  If the answer to either of the questions is "no," then the
      grand jury should not hesitate and not indict.
24

25    See Ex. B at 8.  Of the two sentences containing the word 'should," the latter of the two essentially

26    states that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have

27    intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See

28    Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the

1   grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S.

2   338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination

3   whether there is probable cause and the protection of citizens against unfounded criminal

4   prosecutions.") (citation omitted).

5           By the same token, if Judge Burns said that "the case should move forward" if there

6   is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable

7   cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would

8   have to have intended two different meanings of the word "should" in the space of two consecutive

9   sentences.  That could not have been his intent.  But even if it were, no grand jury could ever have

10  had that understanding.[8]  Jurors are not presumed to be capable of sorting through internally

11  contradictory instructions.  See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995)

12  ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct

13  one") (citation, internal quotations and brackets omitted).

14          Lest there be any room for ambiguity, on no less than four occasions, Judge Burns

15  made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

16          (1)   The first occasion occurred in the following exchange when Judge Burns

17  conducted voir dire and excused a potential juror (CSW):

18              The Court: . . . If there's probable cause, then the case should go
                forward.  I wouldn't want you to say, "Well, yeah, there's
19              probable cause.  But I still don't like what the government is
                doing.  I disagree with these laws, so I'm not going to vote for it
20              to go forward."  If that's your frame of mind, then probably you
                shouldn't serve.  Only you can tell me that.
21              Prospective Juror: Well, I think I may fall in that category.
                The Court: In the latter category?
22              Prospective Juror: Yes.
                The Court: Where it would be difficult for you to support a charge
23              even if you thought the evidence warranted it?
                Prospective Juror: Yes.
24              The Court: I'm going to excuse you then.

25

26
    _____

27      [8]  This argument does not turn on Ms. Sanchez's view that the Navarro-Vargas/Marcucci
    reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the
28  context in which the word is employed by Judge Burns in his unique instructions, context which
    eliminates the Navarro-Vargas/Marcucci reading as a possibility.

See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  See id. ("I wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

(2)  In an even more explicit example of what "should" meant, Judge Burns makes clear that it there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

Court        . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against criminalizing some drugs.

That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a crime was committed?  Yes.  Does it seem to me that this person's involved?  It does."  *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?"  Id. at 27.  The potential juror responded: "It would depend on the case."  Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case."  Thus, it is clear that Judge Burns's

point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

(3) As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

(4) And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court: In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court: Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should"

1  employed in <u>Marcucci</u>.  <u>See</u> <u>United States v. Cortez-Rivera</u>, 454 F.3d 1038, 1040-41 (9th Cir. 2006).

2  <u>Cortez-Rivera</u> is inapposite for two reasons.  First, Judge Burns did not use the term "should" in the

3  passage quoted above.  Second, that context, as well as his consistent use of a mandatory meaning

4  in employing the term, eliminate the ambiguity (if there ever was any) relied upon by <u>Cortez-Rivera</u>.

5  The instructions again violate <u>Vasquez</u>, which plainly authorized consideration of penalty

6  information.  <u>See</u> 474 U.S. at 263.

7        Nothing can mask the undeniable fact that Judge Burns explicitly instructed the jurors

8  time and time again that they had a duty, an obligation, and a singular prerogative to indict each and

9  every case where there was probable cause.  These instructions go far beyond the holding of

10  <u>Navarro-Vargas</u> and stand in direct contradiction of the Supreme Court's decision in <u>Vasquez</u>.

11  Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire,

12  could possibly believe what the Supreme Court held in <u>Vasquez</u>:

13            The grand jury does not determine only that probable cause exists
              to believe that a defendant committed a crime, or that it does not.
14            In the hands of the grand jury lies the power to charge a greater
              offense or a lesser offense; numerous counts or a single count;
15            and perhaps most significant of all, a capital offense or a non-
              capital offense – all on the basis of the same facts.  Moreover,
16            "[t]he grand jury is not bound to indict in every case where a
              conviction can be obtained."

17

18  474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly,

19  J., dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls

20  not only the initial decision to indict, but also significant decisions such as how many counts to

21  charge and whether to charge a greater or lesser offense, including the important decision whether

22  to charge a capital crime.").  Nor would the January 2007 grand jury ever believe that it was

23  empowered to assess the "the need to indict." <u>See</u> <u>id.</u> at 264.  Judge Burns's grand jury is not

24  <u>Vasquez</u>'s grand jury.  The instructions therefore represent structural constitutional error "that

25  interferes with the grand jury's independence and the integrity of the grand jury proceeding." <u>See</u>

26  <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must therefore be

27  dismissed. <u>Id.</u>

28        The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure

1   for the instructions' excesses.   The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's

2   discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the

3   unreviewability of its decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that

4   a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process

5   and its *function* that make it independent."  <u>Id.</u> at 1202 (emphases in the original).

6           Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes

7   that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and

8   unreviewability of many of its decisions -- sufficiently protects that power."  <u>See id.</u> at 1214

9   (Hawkins, J., dissenting).  The flaw in the majority's analysis is that "[i]nstructing a grand jury that

10  it lacks power to do anything beyond making a probable cause determination ... unconstitutionally

11  undermines the very structural protections that the majority believes save[] the instruction."  <u>Id.</u>

12  After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'"

13  <u>Id.</u> (quoting <u>Richardson v. Marsh,</u> 481 U.S. 200, 206 (1987)).  If that "invariable assumption" were

14  to hold true, then the grand jurors could not possibly fulfill the role described in <u>Vasquez</u>.  Indeed,

15  "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions

16  because nothing will happen if they disobey them."  <u>Id.</u>

17          In setting forth Judge Hawkins' views, Ms. Sanchez understands that this Court may

18  not adopt them solely because the reasoning that supports them is so much more persuasive than the

19  majority's sophistry.  Rather, she sets them forth to urge the Court *not to extend* what is already

20  untenable reasoning.

21          Here, again, the question is not an obscure interpretation of the word "should",

22  especially in light of the instructions and commentary by Judge Burns during voir dire discussed

23  above - unaccounted for by the Court in <u>Navarro-Vargas II</u> because they had not yet been disclosed

24  to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the

25  recognition of that right in <u>Vasquez</u>, <u>Campbell</u>, and both <u>Navarro-Vargas II</u> opinions.  <u>Navarro-</u>

26  <u>Vargas II</u> is distinguishable on that basis, but not only that.

27          Judge Burns did not limit himself to denying the grand jurors the power that <u>Vasquez</u>

28  plainly states they enjoy.  He also excused prospective grand jurors who might have exercised that

1   Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere

2   to [that] principle...." See Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy

3   of its deliberations cannot embolden grand jurors who are no longer there, likely because they

4   expressed their willingness to act as the conscience of the community. See Navarro-Vargas II, 408

5   F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves

6   ... to protect the accused from the other branches of government by acting as the 'conscience of the

7   community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The

8   federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand

9   jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both

10  fashioned his own rules and enforced them.

11  **D.          The Instructions Conflict with Williams' Holding That There Is No
                  Duty to Present Exculpatory Evidence to the Grand Jury.**
12

13          In Williams, the defendant, although conceding that it was not required by the Fifth

14  Amendment, argued that the federal courts should exercise their supervisory power to order

15  prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure

16  required by Fifth Amendment common law. See 504 U.S. at 45, 51. Williams held that "as a

17  general matter at least, no such 'supervisory' judicial authority exists." See id. at 47. Indeed,

18  although the supervisory power may provide the authority "to dismiss an indictment because of

19  misconduct before the grand jury, at least where that misconduct amounts to a violation of one of

20  those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to

21  ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as

22  "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id. at 47

23  (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own

24  initiative, rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the

25  defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law.

26  See id. at 51-55.

27          Despite the holding in Williams, the instructions here assure the grand jurors that

28  prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at

20.

>Now, again, this emphasizes the difference between the function
>of the grand jury and the trial jury. You're all about probable
>cause. If you think that there's evidence out there that might
>cause you say "well, I don't think probable cause exists," then it's
>incumbent upon you to hear that evidence as well. As I told you,
>in most instances, *the U.S. Attorneys are duty-bound to present
>evidence that cuts against what they may be asking you to do if
>they're aware of that evidence*.

Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and

their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear

in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters

presented to you." See id. at 27. The Ninth Circuit has already concluded it is likely this final

comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective

powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II

somehow concluded was not conveyed by the previous instruction: "You're all about probable

cause." See Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to

probable cause determinations (a reminder that was probably unnecessary in light of the fact that

Judge Burns had already told the grand jurors that they likely would be excused if they rejected this

limitation). The instruction goes on to tell the grand jurors that they should consider evidence that

undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The

end result, then, is that grand jurors should consider evidence that goes against probable cause, but,

if none is presented by the government, they can presume that there is none. After all, "in most

instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be

asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns

informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's

something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to

do that*." See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it

necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors

"can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be

1   honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

2           These instructions create a presumption that, in cases where the prosecutor does not

3   present exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case

4   in which no exculpatory evidence was presented, would proceed along these lines:

5           (1)  I have to consider evidence that undercuts probable cause.

6           (2)  The candid, honest, duty-bound prosecutor would, in good faith, have presented

7                any such evidence to me, if it existed.

8           (3)  Because no such evidence was presented to me, I may conclude that there is none.

9   Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

10  evidence presented represents the universe of all available exculpatory evidence; if there was more,

11  the duty-bound prosecutor would have presented it.

12          The instructions, therefore, discourage investigation -- if exculpatory evidence were

13  out there, the prosecutor would present it, so investigation is a waste of time -- and provide

14  additional support to every probable cause determination: i.e., this case may be weak, but I know that

15  there is nothing on the other side of the equation because it was not presented.  A grand jury so badly

16  misguided is no grand jury at all under the Fifth Amendment.[9]

17

18          [9] Judge Moskowitz has recently ruled on a motion similar to that filed by Ms. Sanchez.  See

19  United States v. Martinez-Covarrubias, Case No. 07CR0491-BTM, Order Denying Defendant's
    Motion to Dismiss the Indictment, dated October 11, 2007 (attached hereto as Exhibit J). While Ms.

20  Sanchez disagrees with Judge Moskowitz's analysis, Judge Moskowitz at least recognizes that a
    portion of the instruction is error, although he incorrectly found that it was not structural. Ex. J at

21  11. Because, under Judge Moskowitz's analysis, this Court must determine whether the error was

22  harmless, Ms. Sanchez asks that this Court order the government to produce the transcripts of the
    grand jury proceedings that resulted in the instant indictment.  The Court may order disclosure of

23  grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss
    the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P.

24  6(e)(3)(E)(ii).  The Ninth Circuit requires a "particularized need" to justify disclosure, see United

25  States v. Walczak, 785 F.2d 852, 857 (9th Cir. 1986), but that need cannot be any different than the
    standard set for in Rule 6(e)(3)(E)(ii): Ms. Sanchez need only show that "a ground *may* exist to

26  dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P.
    6(e)(3)(E)(ii) (emphasis added).   That is why the Rule's "general suggestion [is] in favor of

27  disclosure."  See Walczak, 785 F.2d at 857. Here, under Judge Moskowitz's approach to Judge

28  Burns' erroneous instruction, it is clear that, at the very least, "a ground may exist to dismiss the
    indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.

## <u>LEAVE TO FILE FURTHER MOTIONS</u>

Ms. Sanchez and defense counsel have not received any discovery in this case. As new information surfaces – via discovery provided by government, defense investigation, or an order of this court – the defense may need to file further motions, or to supplement existing motions. For this reason, defense counsel requests leave to file further motions.

## VI.

## <u>CONCLUSION</u>

For the reasons stated, Ms. Sanchez requests that this Court grant her motions.

Respectfully Submitted,

*s/ Bridget Kennedy*

Dated: March 27, 2008                **BRIDGET KENNEDY**
Federal Defenders of San Diego, Inc.
Attorneys for Ms. Sanchez